UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:                                             Case No. 05-41122-RJK
                                                   Chapter 7
Daniel C Bauer and
Laurie A. Bauer,

       Debtors.

Randall L. Seaver, Trustee,                        Adv. No. 05-4149-RJK

       Plaintiff,

vs.

Daniel C. Bauer and
Laurie A. Bauer,

       Defendants.

## DEFENDANTS' TRIAL BRIEF

Defendants respectfully submit this trial memorandum.

## ITEMIZED FACTS

1. Dan Bauer is a high school graduate and has worked as a business opportunity broker for the past 8 years. He is paid on a straight commission basis.

2. Laurie Bauer has a bachelor's degree in nursing and worked as a labor and delivery nurse for 15 years. She now operates a sole proprietorship selling Mary Kaye Cosmetics.

3. The Bauers have two children, Adam, now 17, and Allyson, now 13.

4. In the summer of 2003, it became apparent that Adam, then aged 15, was using drugs and alcohol. He started weekly counseling sessions at $120 per session not covered by insurance. The Bauers

investigated in-patient treatment and found it would run between $15,000 and $30,000 and was not covered by insurance.

5. In September, 2003 Adam seemed to be improving and his counseling sessions decreased to biweekly. Consideration of in-patient treatment was put on hold.

6. In October 2003, the Schneiders sent Laurie Bauer two checks for $2,000 each for the Bauers to use to buy ATVs as gifts for the Bauer children.

7. In January 2004, Adam was charged with possession of marijuana at school.

8. Adam was expelled from the alternative school he attended in March.

9. In the summer of 2004, Adam, Dan and Elmer worked on restoring the 1985 Jeep Dan owned in an effort to keep Adam occupied and away from drugs.

10. Upon returning to school in September 2004, Adam again began skipping school and getting detentions. The Bauers increased Adam's counseling sessions and resolved that this time they would follow through with in-patient treatment. Because the Bauers did not have the money to pay for the treatment, Dan began to look for ways to raise the money for the treatment.

11. Discussions ensued between the Bauers and Elmer and Colleen Schneider, Laurie's parents, about the treatment needed for Adam. Dan offered to transfer to the Schneiders the two ATVs purchased for the Bauer children, a disassembled 1985 Jeep and Dan's motorcycle. The Schneiders' promised to pay for the treatment and accepted the offer of the vehicles. Dan paid off the remaining balance due on the ATVs.

12. The vehicles, the motorcycle and most of the Jeep parts were already kept at the Schneiders' residence in Iowa. In September or October 2004, Dan delivered the reminder of the Jeep parts to the Schneiders and signed over the titles and registration cards. Dan did not expect to get them back and expected that the Schneiders would transfer the titles and sell the Vehicles if necessary.

2

13. By the first week in October, 2004 the Bauers had placed Adam on a waiting list for an in-patient treatment at the Powell Chemical Dependency program in Des Moines. He was also on a waiting list for an out-patient facility in Eden Prairie. Adam however refused to go and promised to clean up on his own. He showed some signs of improvement.

14. But in November, 2004, Adam was again suspended from school for possession of marijuana. In December 2004 he was arrested for shoplifting and damaged an automatic door in attempting escape. He was charged with a felony. He met with a Parole Officer and was offered a program whereby his felony charges could be diverted.

15. On January 21, 2005, Dan set up a new LLC called DAB Installations, LLC (short for Dad and Adam Bauer) so that Adam can start a fledgling garage door opener installation business. Dan hopes that he and Adam can work in this business together to get Adam a new start.

16. On January 27, 2005, Adam is again arrested for felony possession of marijuana which also violates both his prior probations. Adam is required to retain an attorney. The Bauers seek a public defender and are advised that they will not qualify for one due to their income.

17. On January 30, 2005, the Bauers met with Avery Appleman, a criminal defense lawyer who agrees to represent Adam in connection with the felony possession charge for $3,000 payable up front.

18. On February 5, 2005, DAB Installations opens a checking account at First Minnesota Bank in Minnetonka. Dan Bauer and Adam Bauer are both listed on the account.

19. On February 6, 2005, Dan Bauer transferred $3,000 from his checking account to DAB Installations' account. On February 7, 2005, DAB wrote a check to Avery Appleman to cover Adam's attorneys' fees. The payment was made through DAB Installations, the company set up for Adam, to give Adam some sense of responsibility for the cost of his behavior.

20. On February 8, 2005, the Bauers meet with a chemical dependency evaluator who recommends in-patient treatment for Adam. Adam resolves to do better.

21. By February 15, 2005, Adam's drug use had spiraled to new levels including cocaine. On February 18, 2005, Adam was scheduled for court for his felony possession charge.

22. Ferkul filed the bankruptcy petition on February 27, 2005.

23. In March, 2004, Dan received an email from his brother David demanding that Dan sell the Vehicles and repay David the money David claims Dan owes him for a failed business venture. Dan forwarded the email to Mark Ferkul and explained to Ferkul that the Vehicles had already been sold.

24. Ferkul recognized that the sale of the Vehicles was not disclosed but did not have the documents necessary for him to conclude whether the Vehicles had been transferred or not. These were obtained on April 11 and 12. Ferkul then concluded that because the titles had already been transferred, he could not amend the schedules to disclose these items because the Bauers no longer owned them. He does not advise the Bauers of any need to amend the Statement of Financial Affairs. Ferkul advises the Bauers to simply disclose the transaction at the first meeting of creditors.

25. At the first meeting of creditors on April 5, 2006, the Bauers explained the transaction to the Trustee. They also explained the payment to Avery Appelman. The payment was made after the Bauers had completed their bankruptcy schedules but before the petition had been filed.

26. On April 10, 2005, Elmer Schneider paid $3,500 for the transport team to take Adam to treatment in Utah and on April 12, 2005, Elmer paid $12,950 for Adam's treatment.

27. The Trustee demanded that the Schneiders turn over the Vehicles and the Schneiders complied. The Trustee sold the two ATVs belonging to the Bauer children at auction on June 2, 2005 for $2,200 and $3,700. He also sold the Jeep for $2,700 and the motorcycle for $5,500. Elmer Schneider purchased one of the ATVs for $2,200 and the Jeep for $2,700.

28.     The Trustee commenced this action on June 2, 2005.

## ARGUMENT

As specifically pleaded in his complaint, the Trustee seeks to deny the Bauers their discharge based on two subsections of 11 U.S.C. § 727(a)(2) and 727(a)(4). For the following reasons, the Trustee cannot succeed and the Bauers should be granted their discharge.

### A.     **Denial of Discharge is a "Harsh Remedy" Not Warranted Here.**

The denial of a debtor's discharge is a "harsh sanction," therefore, the provisions of 11 U.S.C. § 727(a) are "strictly construed in favor of the debtor." The burden of proof is on the objecting party to prove each element of a section 727 Complaint by a preponderance of the evidence.

*In re Sendecky* 283 B.R. 760, 763 (8th Cir.BAP.2002).

### B.     **Denial of Discharge is Not Warranted Under 11 U.S.C. § 727(a)(2).**

Section 727(a)(2) provides:

**(a)**     The court shall grant the debtor a discharge, unless –

    **(2)**     the debtor, with an intent to hinder, delay of defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed –

        **(A)**     property of the debtor, within one year before the date of the filing of the petition; or

        **(B)**     property of the estate, after the date of the filing of the petition;

The court should deny a debtor a discharge if he concealed *assets that might otherwise be made available to satisfy the claims of creditors*. *In re Sendecky*, 283 B.R. 760, 763 (8th Cir.BAP 2002). The determinative issue is one of intent a factually-intensive analysis. The Eighth Circuit has approved the use of the same inferential process in applying the statutory language "with intent to hinder, delay or defraud creditors," wherever that language is found--in state fraudulent-transfer statutes, 11 U.S.C. § 548(a), or 11 U.S.C. § 727(a)(2). *In re Graven,* 936 F.2d 378, 383 (8th Cir.1991) (applying both Missouri enactment of UFCA and 11 U.S.C. § 548(a)(1), and noting that they use "the same standard"); *In re Graven,* 64 F.3d 453, 456 (8th Cir.1995) (ditto); *In re Sherman,* 67 F.3d 1348, 1353 (8th Cir.1995) (noting "it was appropriate *482 for the bankruptcy court to utilize Missouri's codification of the common law badges of fraud in its analysis"

5

under 11 U.S.C. § 548(a)(1)). *See also Norwest Bank Nebraska, N.A. v. Tveten,* 848 F.2d 871, 874 (8th Cir.1988) (standard in challenge to discharge under 11 U.S.C. § 727(a)(2)(A), where facts involved transfer of asset value from non-exempt to exempt form, is the same as that governing underlying claim of exemption under state law).

*In re Sholdan* 218 B.R. 475, 481-482 (Bankr.D.Minn.1998).

> In short, since direct evidence of wrongful intent is rarely forthcoming, the court may infer such intent from evidence of the several badges of fraud and the "circumstances surrounding the transfer." *Brown v. Third Nat'l Bank (In re Sherman),* 67 F.3d 1348, 1353 (8th Cir.1995). The presence of several or more "badges of fraud" gives rise to a presumption of fraudulent intent. *In re Northgate Computer Systems, Inc.,* 240 B.R. 328, 360-61 (Bankr.D.Minn.1999) (*citing Kelly v. Armstrong,* 141 F.3d 799, 802 (8th Cir.1998); *In re Bateman,* 646 F.2d 1220, 1223 (8th Cir.1981); *In re Sherman,* 67 F.3d at 1353-1354) (presence of several badges of fraud "can constitute conclusive evidence" of the proscribed intent). Among the badges of fraud that the trial court may consider in passing on the issue of intent are:
>
> 1. the transfer or obligation was to an insider;
> 2. the debtor retained possession or control of the property transferred after the transfer;
> 3. the transfer or obligation was disclosed or concealed;
> 4. before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
> 5. the transfer was of substantially all the debtor's assets;
> 6. the debtor absconded;
> 7. the debtor removed or concealed assets;
> 8. the value of the consideration received by the debtor was not reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
> 9. the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
> 10. the transfer occurred shortly before or shortly after a substantial debt was incurred; and
> 11. the debtor transferred the essential assets of the business to a lienor was transferred the assets to an insider of the debtor.
> *Northgate Computer Systems, Inc.,* 240 B.R. at 360-61.

*In re Maronde,* 332 B.R. 593, 600 (Bankr.D.Minn. 2005).

> The presence of several or more of these "badges of fraud" gives rise to a presumption of fraudulent intent. *Kelly v. Armstrong,* 141 F.3d 799, 802 (8th Cir.1998); *In re Bateman,* 646 F.2d 1220, 1223 (8th Cir.1981). *Cf. In re Sherman,* 67 F.3d at 1353-1354 (presence of several badges of fraud "can constitute conclusive evidence" of the proscribed intent) (citation and internal quotes omitted). If the trustee makes out the basis for such a presumption, the burden shifts to the transferee--which must prove "some legitimate supervening purpose for the transfers at issue." *Kelly v. Armstrong,* 141 F.3d at 802.

*In re Northgate Computer Systems, Inc.,* 240 B.R. 328, 360 (Bankr.D.Minn. 1999).

1.  **The Vehicles.**

In order to prevail under section 727(a)(2)(A) the Trustee must first establish that there was a transfer of *property of the debtor.*

> To prevail under this section, the plaintiff must show that the debtor has engaged in the proscribed conduct and that the property involved must be property of the debtor or the property of the debtor's estate (if the transfer occurred post-petition). *Riumbau v. Colodner (In re Colodner),* 147 B.R. 90, 93 (Bankr.S.D.N.Y.1992) (citing *MCorp Management Solutions, Inc. v. Thurman (In re Thurman),* 901 F.2d 839, 841 (10th Cir.1990); *CIT Group/Factoring Mfr. Hanover, Inc. v. Srour (In re Srour),* 138 B.R. 413 (Bankr.S.D.N.Y.1992)). Moreover, the debtor must have more than a mere *derivative interest* in the property in question because the term "property of the debtor," as expressed in 11 U.S.C. § 727(a)(2)(A), has reference to property in which the debtor has a *direct* proprietary interest. *In re Colodner,* 147 B.R. at 93 (citing *MCorp. Management Solutions, Inc.,* 901 F.2d at 841) (Congress intended to limit the reach of § 727(a)(2)(A) only to those transfers of property in which the debtor has a direct proprietary interest).

*In re Wagner*, 305 B.R. 472, 475 (8th Cir.BAP 2004).

The two all terrain vehicles ("ATVs") here were not property of the debtors. The undisputed testimony is that the ATVs were purchased by the Bauers as gifts for their two children in the spring of 2004 and were partially paid for by the Schneiders. On October 3, 2003, Colleen Schneider issued two checks in the amount of $2,000 each. These checks were payable to Laurie Bauer but were to be used to purchase two ATVs, one for each of the Bauers' two minor children. The Bauers subsequently purchased two ATVs. The ATVs were registered in the name of Dan Bauer because minors cannot register ATVs in Minnesota even if they are the owners.

In Minnesota, definition of an "all terrain vehicle" and the "owner" of an all terrain vehicle is provided in Minn. Stat. § 84.92:

> **Subd. 8.** All-terrain vehicle. "All-terrain vehicle" or "vehicle" means a motorized flotation-tired vehicle of not less than three low pressure tires, but not more than six tires, that is

limited in engine displacement of less than 800 cubic centimeters and total dry weight less than 900 pounds.

**Subd. 5.** Owner. "Owner" means a person, other than a person with a security interest, having a property interest in or title to an all-terrain vehicle and entitled to the use and possession of the vehicle.

ATVs must be registered. Minnesota Statutes section 84.922 provides in part:

**Subdivision 1.** General requirements. Unless exempted in subdivision 1a, a person may not operate and an owner may not give permission for another to operate an all-terrain vehicle within the state unless the vehicle has been registered with the commissioner of natural resources, or is exempt from registration.

Persons under 18 may not register an ATV:

**Subd. 10.** Registration by minors prohibited. No person under the age of 18 may register an all-terrain vehicle.

Minn. Stat. § 84.922.

Because of the statutory definition of "Owner" owner includes persons other than the title holder, the name on the registration card is not conclusive proof of ownership. Because the ATVs were not property of the Debtors at the time they were transferred to Elmer Schneider in September or October 2004, their transfer does not qualify as a basis for denial of discharge under 11 U.S.C. § 727(a)(2)(A).

That leaves the transfer of a 1985 Jeep in pieces and a 2002 Honda motorcycle each of were owned by Dan Bauer and each of which had at least some value. But a transfer of property of the debtor even property with value is not enough. The Trustee must also establish that the property transferred could not have been exempted in the debtor's bankruptcy.

> [A] debtor's transfer of property which would have been exemptible from the estate in his ensuing bankruptcy case does not constitute a transfer avoidable under § 548(a), *In re Treadwell,* 699 F.2d 1050 (11th Cir.1983), *In re Weis,* 92 B.R. 816 (Bankr.W.D.Wis.1988), and *In re Robinett,* 47 B.R. 591 (Bankr.S.D.Fla.1985), and does not support an objection to discharge under 11 U.S.C. § 727(a)(2)(A), *In re Agnew,* 818 F.2d 1284 (7th Cir.1987), and *In re MacDonald,* 50 B.R. 255 (Bankr.D.Mass.1985).

*In re Miera* 104 B.R. 989, 992 (Bankr.D.Minn.1989).

As Judge Kishel explained in *Miera*:

> These decisions are based on the principle of "no harm, no foul." This Court has no quarrel with their general proposition, stemming as it does from certain fundamental precepts of bankruptcy and debtor-creditor law. In fact, that proposition could fairly be seen as a reasonable corollary to several prior decisions of judges of this Court. *See In re Drenckhahn,* 77 B.R. 697, 705 (Bankr.D.Minn.1987), and *In re Clausen,* 44 B.R. 41, 43 (Bankr.D.Minn.1984) (both holding that only a transfer of property which otherwise would have been distributed to creditors through the bankruptcy estate is subject to sanction under 11 U.S.C. § 727(a)(2)).

*In re Miera*, 104 B.R. 989, 993 (Bankr.D.Minn.1989).

The disassembled Jeep and the motorcycle, had they not been transferred, could have been exempted by the Debtors and would have had no value for the estate. The Debtors elected the federal exemptions. They claimed only $818.00 in equity for their homestead out of a possible $36,900 in equity for joint debtors leaving an unused portion of $36,082.00. Thus under section 522(d)(5) they were entitled to exempt property of $975.00 x 2 = $1,950 plus up to $18,500 ($9,250 x 2) of the unused portion of their homestead exemption for a total (d)(5) of $20,450.00. Reviewing the Debtors' Schedule C, the Debtors have property exempt under 522(d)(5) totaling $14,310 leaving unused (d)(5) of $6,140.00. The Trustee has not objected to the Debtors' claimed exemptions and the time to do so has passed.

Dan Bauer testified that he believed the Jeep to be essentially worthless in its disassembled condition. But by the time of the sale, the Jeep had been partially reassembled. The Trustee sold the Jeep (to Elmer Schneider) for $2,700. He sold the motorcycle to an unrelated party for $5,500.00, a total of $8,200.00. But the Jeep had been further restored at the time of sale from the time when it was transferred to Elmer Schneider

Dan Bauer testified at his first meeting of creditors that he believed the Jeep to be essentially worthless in its condition at the time of transfer and the motorcycle to be worth around $5,000, well within the remaining (d)(5) exemption amount. Because there was nothing

9

of value to the estate that was transferred, the transfers of the Jeep and the Honda motorcycle cannot serve as a basis for denial of discharge under the "no harm, no foul" rule described in *Miera.*

Finally, even if the Trustee was able to overcome these hurdles, he must then establish that the Debtors had the intent to hinder, delay or defraud creditors in making the transfers. The Debtors' stated (and uncontroverted) intent was to obtain money to pay for their 16 year old son's drug rehabilitation therapy which Dan Bauer testified could run between $15,000 and $30,000. There is nothing suspect or inappropriate about a parent selling his property to pay for his son's necessary medical treatment even if the property could have been used to pay creditors.

The Trustee's apparent suggestion that the Bauers should have used the proceeds of these vehicles to pay creditors instead of necessary drug rehabilitation treatment for their son is contrary to their preeminent duties as parents, to support and provide medical treatment for their children. The claim that in using their sole remaining salable assets to arrange for payment of needed treatment the Bauers intentionally committed a fraud on creditors is simply absurd.

The Trustee will attempt to and will succeed in establishing two or three of the "badges of fraud" cited above. For example, the Debtors do not dispute that the transfer was to an insider. The Debtors do not dispute that they were able to use the transferred property while it was in the possession of the Schneiders. The Trustee may even seek to establish that the Debtors may have been insolvent at the time of the transfers in the fall of 2004. However, the transfers were disclosed to the Debtors' bankruptcy counsel and to the Trustee at the first meeting of creditors and later in their deposition. The Debtors had not been sued or threatened with suit. The transfer was not of substantially all the Debtors' assets. The Debtors did not abscond, did not remove or conceal assets. Moreover, the value of the promise the Schneiders made, to pay

for the treatment was reasonably equivalent to the value of the items transferred. The transfer did not incur shortly before or after a substantial debt had been incurred. Nor did the Debtors transfer essential assets of a business to a lienor who transferred the assets to an insider of the Debtors.

But even if a presumption of fraud arising from the confluence of several badges of fraud could be established, the Debtors may refute the presumption by demonstrating a "legitimate supervening purpose" for the transfer:

> Once a trustee establishes a confluence of several badges of fraud, the trustee is entitled to a presumption of fraudulent intent. *See Acequia,* 34 F.3d at 806; *In re Bateman,* 646 F.2d 1220, 1223 (8th Cir.1981). In such cases, "the burden shifts to the transferee to prove some 'legitimate supervening purpose' for the transfers at issue." *Acequia,* 34 F.3d at 806.

*Kelly v. Armstrong* 141 F.3d 799, *802 (C.A.8 (Neb.),1998).

> And, it has been recognized that where there is "significantly clear" evidence of a "legitimate supervening purpose," a court may find no intent to defraud even in the presence of several "badges of fraud." See *Max Sugarman Funeral Home v. A.D.B. Investors,* 926 F.2d 1248, 1254-55 (1st Cir.1991).

*In re Earle* 307 B.R. 276, 296 (Bankr.S.D.Ala.2002).

> There is no bright line test for what constitutes a legitimate supervening purpose; the issue is simply whether the presumption of fraud has been adequately rebutted. *See In re Bateman,* 646 F.2d 1220, 1223 n. 4 (8th Cir.1981) ("The burden which shifts now upon a showing of reasonable grounds is not a burden of going forward with the evidence requiring the bankrupt to explain away natural inferences, but a burden of proving that he has not committed the objectionable acts with which he has been charged.") (quoting *Shainman v. Shear's of Affton, Inc.,* 387 F.2d 33, 37 (8th Cir.1967)).

*Aptix Corp. v. Quickturn Design Systems, Inc.* 148 Fed.Appx. 924, 929 (Fed.Cir.2005).

Here there is a clear *legitimate supervening purpose* that supersedes any circumstantial evidence of an intent to hinder, delay or defraud that may be presumed as a result of the badges of fraud. The Bauers' minor son Adam needed in-patient drug rehabilitation therapy expected to cost between $15,000 and $30,000. The treatment facilities all required cash in advance. The

treatment was not covered by the Bauers' insurance. The Bauers did not have enough cash to pay for the treatment. The Bauers offered to transfer the kids' four wheelers, Dan's Jeep and motorcycle in exchange for the Schneiders' agreement to pay for the treatment. The Schneiders accepted the offer and the vehicles were transferred. The promise to pay for the treatment was sufficient consideration so that the transaction was not avoidable for want of consideration. The fact that the Schneiders were not called upon to pay for the treatment until after the Bauers had filed bankruptcy is irrelevant. It is the intent at the time of the transfer that is being scrutinized.

The transfer was legitimate because under Minnesota law, parents have a duty to provide support for their children that begins at birth. *Jacobs v. Jacobs*, 309 N.W.2d 303 (Minn.1981). A parent's duty of support includes the medical needs of a minor child. *Korf v. Korf*, 553 N.W.2d 706, 708 (Minn.App.1996). In fact, parents can be criminally liable for refusing necessary care for their children. Minn. Stat. § 609.378.

This is not a situation where the Bauers converted non-exempt assets into exempt assets as part of pre-bankruptcy planning. It is not a situation where assets were conveyed to a friend or relative for minimal or no consideration. These vehicles were conveyed in exchange for the Schneiders' promise to pay for the treatment the Bauers could not afford. The Schneiders ultimately paid for the treatment. They also voluntarily surrendered the vehicles to the Trustee without any adjudication of liability or turnover order from the Court.

    **2.**    **The Payment to Their Son's Attorney.**

As a result of his chemical dependency and related problems, Adam was arrested on January 27, 2005 for felony possession of marijuana which violated the conditions of both of his prior probations. Under Minnesota law, a juvenile offender charged with a felony or gross misdemeanor must be represented by an attorney. Minn.R.Juv.Delinq.P. 3.02. If a juvenile cannot afford an attorney, a public

defender will be appointed. *Id*. The resources of the parents are considered in determining whether a child cannot afford an attorney. Minn.R.Juv.Delinq.P. 3.06. If parents have resources, but decline to retain an attorney, the court may order the parents to pay. *Id.*

The Bauers sought a public defender for Adam but were told that in order to qualify they would need to have essentially no income. The Bauers therefore reasonably believed at the time that they were required to pay for Adam's lawyer as part of their support obligations as parents. Payment of the $3,000 to attorney Avery Appelman was a prepaid amount for his services he required before he would represent Adam. The sole intent of the payment was to procure Mr. Avery's services, not to hinder, delay or defraud creditors.

The badges of fraud analysis does not apply to the payment to attorney Appleman. While the payment was for the benefit of an insider, their son, it was made as a part of a support obligation. The Bauers had no further control over the $3,000 once paid to Appleman. Moreover, again the Debtors have offered a *legitimate intervening purpose* for the payment to Avery Appleman. A legitimate intervening purpose successfully rebuts any showing of actual fraud. *See In re Sherman*, 67 F.3d 1348, 1354 (8th Cir.1995) (stating that badges of fraud are sufficient to establish actual fraudulent intent, "absent significantly clear evidence of a legitimate supervening purpose").

### B. False Oaths.

The second prong of the Trustee's case is premised on alleged false oaths resulting from the failure of the Debtors to disclose the transfers to the Schneiders and the payment to Avery Appleman. In order for a discharge to be denied for a false oath, it must be made knowingly and fraudulently in connection with the bankruptcy.

> A false oath bars discharge in bankruptcy if it is both material and made with an intent to defraud. *See Korte v. Internal Revenue Serv. (In re Korte),* 262 B.R. 464, 474 (B.A.P. 8th Cir.2001). "Intent can be established by circumstantial evidence, and statements made with reckless indifference to the truth are regarded as intentionally false." *Id.* (internal

13

quotations and citations omitted). The materiality threshold is low; even a fairly modest asset is material because it need only "bear[ ] a relationship to the bankrupt's business transactions or estate, or concern[ ] the discovery of assets, ... or the existence and disposition of his property." *See Mertz v. Rott,* 955 F.2d 596, 598 (8th Cir.1992) (internal citations omitted).

*In re Bren* 122 Fed.Appx. 285, 286 (8th Cir. 2005).

"The subject matter of a false oath is 'material,' and thus sufficient to bar discharge, if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *In re Chalik,* 748 F.2d 616, 618 (11th Cir.1984) (per curiam). *In re Olson*, 916 F.2d 481, 484 (8th Cir. 1990).

The party objecting to the discharge must show that the information was omitted for the specific purpose of perpetrating a fraud and not simply because the debtor was careless or failed to fully understand his attorney's instructions. *In re Seablom*, 45 B.R. 445, 449 (Bankr.D.N.D.1984)).

### 1. Alleged False Oaths re the ATVs, Jeep and Motorcycle.

While meeting with their counsel before the case was filed, Dan Bauer told Mr. Ferkul that he had sold some property including a motorcycle. Mr. Ferkul advised that sold property need not be listed on the schedules.

Later, after the time the bankruptcy was filed but before date of the first meeting of creditors, Mr. Ferkul learned that the transfers were made to Laurie's dad. Mr. Ferkul advised the Bauers to answer truthfully about the transactions at the first meeting but did not advise the Bauers of any need to amend the schedules or the Statement of Financial Affairs.

Generally, if an item is omitted upon the honest advice of counsel, to whom the debtor has disclosed all pertinent facts, the item would not be deemed falsely omitted. *In re Mascolo*, 505 F.2d 274, 277 (1st Cir.1974); *Hanover Capital Trust Co. v. Meyer*, 57 F.2d 815 (3d Cir.1932); *In re Morris*, 58 B.R. 422, 427 (N.D.Tex.1986).

While an advice of counsel defense does not cover all situations, it applies in this case. The requirement that a transfer within a year be disclosed in item 10 of the Statement of Financial Affairs seems obvious enough on its face. But whether a sale of ATVs belonging to the Bauer children and registered in the name of Dan Bauer, is a matter to be disclosed is not obvious. Whether a sale of an item of little value such as a disassembled vehicle, needs to be disclosed is not obvious. Whether a sale of a motorcycle with admitted value but which could have been exempted in a bankruptcy under 11 U.S.C. § 522(d)(5) needed to be disclosed is not obvious. Whether a payment to an attorney for legally mandated criminal defense of a minor is a transfer that needed to be disclosed is not obvious, particularly when Adam's arrests, truancy, drug, counseling and legal problems had become nearly commonplace ordinary course occurrences in the Bauer household.

To find these answers, it is necessary to resort to case law, for example, the application of the "no harm no foul" rule described in *In re Miera* 104 B.R. 989, 992 (Bankr.D.Minn.1989). For debtors without legal research skills, advice of counsel is all they have to go on. If the transfers of these vehicles should have been disclosed but were not it is not because the Bauers knowingly and fraudulently sought to conceal these transactions. To the contrary, the Bauers knowingly and intentionally disclosed these transactions to their attorney who prepared the schedules and statement of financial affairs. The Bauers relied on his advice that disclosure was not necessary, and that the transactions could be disclosed orally at the first meeting and that there was no need to amend the filings to add these items.

**2.     Other Alleged False Oaths.**

In an effort to bolster a losing case, the Trustee is expected to attempt to introduce evidence of other assorted alleged false oaths not specifically alleged in the Complaint. But false oaths must be specifically pleaded in the complaint in order to be actionable as bases for denial

15

of discharge. *In re Cummins*, 166 B.R. 338 (Bankr.W.D.Ark.1994) (Objections to evidence at trial of false oaths not specifically pleaded in complaint sustained). Section 727(a)(4)(A) sounds in fraud and, therefore, is governed by the specificity requirement of Fed. R. Bankr.P. 7009. *In re Brien*, 208 B.R. 255, 257 (1st Cir.BAP.1997). Fraud is an essential element of denial of discharge under 11 U.S.C. § 727(a)(4). To justify a denial of discharge, the false oath must have been made knowingly and fraudulently. The Trustee therefore is required to specifically plead in his complaint what false oath was committed and how it was false. It is not enough for the Trustee to allege generally that the debtor made false oaths "including but not limited to the following" and then state one or two specifically. The reservation cannot circumvent the requirement of Rule 9 for pleading with specificity nor does such reservation preserve the Trustee's ability to present evidence of other false oaths at trial.

## CONCLUSION

The Court will hear at trial a story of two parents struggling to save their son from chemical dependency and delinquency. The Bauers will testify that they transferred the Vehicles to get money to pay for their son's drug treatment. The Schneiders will testify that they accepted the vehicles as payment in return for their promise to pay for the treatment even though the cost of the treatment was expected at the time to exceed the value of these vehicles. In sharp contract to this testimony, the Court will hear the Trustee's assertions that the Debtors' concern over their son is feigned and false, that the Debtors were motivated first and foremost by an intent to hinder, delay or defraud creditors and by an intent to hold on to their toys.

The Trustee will try to paint these Debtors as deceitful liars undeserving of a bankruptcy discharge. The Court will see for itself, however, that these are precisely the types of people the bankruptcy laws were enacted to protect – people besieged with medical and legal problems, in this case,

16

problems of a family member (not even of their own making). These Debtors did not try to convert non-exempt assets into exempt assets or conceal assets for their own benefit. They simply used their property to get money to pay for their son's treatment. They fully disclosed the transaction to the Trustee at the first meeting of creditors.

These Debtors are deserving of a discharge. The Court should rule for the Debtors.

Dated: February 28, 2006

LAPP, LIBRA, THOMSON,
STOEBNER & PUSCH, CHARTERED

/e/ Ralph V. Mitchell
Ralph V. Mitchell (#184639)
One Financial Plaza, Suite 2500
120 South Sixth Street
Minneapolis, MN 55402
(612) 338-5815
ATTORNEYS FOR DEFENDANTS